**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Civil Case No.: 1:19-cv-23420
Criminal Case No.: 1:17-cr-20877-UNGARO**

**ROBERT DEXTER WEIR,
DAVID RODERICK WILLIAMS, AND
LUTHER FIAN PATTERSON,**

          **Petitioners,**

    **v.**

**UNITED STATES OF AMERICA,**

          **Respondent.**

**PETITION FOR ISSUANCE OF WRITS OF ERROR CORAM NOBIS VACATING
CONVICTIONS AND INCORPORATED MEMORANDUM OF FACTS AND LAW IN
SUPPORT**

Defendants Robert Dexter Weir, David Roderick Williams, and Luther Fian Patterson ("Defendants") respectfully petition this Court for the issuance of writs of error coram nobis vacating their convictions under 18 U.S.C. § 2237(a)(2)(B) on the grounds that the Court lacked jurisdiction over their extraterritorial conduct and that their convictions are, therefore, unconstitutional. For the reasons set forth in this incorporated memorandum of law and facts in support, their petition should be granted.

## PRELIMINARY STATEMENT

Defendants are Jamaican nationals and fishermen. On September 13, 2017, they left their homes in Jamaica on board a thirty-two foot, Jamaican-registered boat, the *Jossette* WH 478, for a two-day fishing trip with two other Jamaican fishermen, Patrick Ferguson and George Garee Thompson. The next day, after being blown off-course during an unexpected storm, the United States Coast Guard ("Coast Guard") stopped and boarded the *Jossette* in international waters in the East Caribbean Sea, just outside the territorial waters of Haiti.

During the boarding process, Coast Guard officers asked the crew where they were heading, and one or more of the men responded that they were lost and trying to find their way back to Jamaica. Once onboard, Coast Guard officers searched the *Jossette* and crewmembers for illicit substances. Although none were found onboard the *Jossette* or on any of the crewmembers, the officers forcibly removed Defendants and the other two crewmembers from the *Jossette*, detained them onboard a Coast Guard ship, and destroyed the *Jossette*.

The Coast Guard detained Defendants and their fellow crewmembers for the next thirty-two days, by chaining them to the exposed decks of four different Coast Guard ships. Coast Guard officers ordered the men to strip naked and to dress in paper-thin jumpsuits that did not protect them from the elements. While in Coast Guard custody, Coast Guard officers denied Defendants and the other crewmembers access to shelter, basic sanitation, proper food and water,

1

and medical care. The Coast Guard also denied the men's repeated requests to contact their families in Jamaica, as well as their requests for the Coast Guard to contact their families on their behalf. The men feared, correctly, that their families must have presumed that they were dead.

On October 16, 2017, the Coast Guard delivered Defendants to Miami, and to the custody of the Drug Enforcement Administration. The United States initially charged Defendants with conspiracy to possess with intent to distribute marijuana. Later, the United States admitted that it "would have required a miracle" to prove the drug charges initially made against Defendants; a miracle that it "could not have pulled off." Instead, on January 3 and 5, 2018, Defendants pled guilty to one count of knowingly providing a materially false statement to a federal law enforcement officer, during a boarding, while on board a vessel subject to the jurisdiction of the United States, in violation of 18 U.S.C. § 2237(a)(2)(B).

Having been kept from their homes and their families for more than three months, Defendants' guilty pleas presented them with the fastest possible path back to Jamaica. But Congress lacks the constitutional authority to criminalize the making of false statements by foreign nationals while they are aboard a foreign-flagged vessel located in international waters. This Court also lacked jurisdiction to accept Defendants' guilty pleas and, accordingly, should grant their petition to vacate their convictions.

First, the High Seas Clause of the U.S. Constitution prohibits the extraterritorial application of United States law where, as here, the charging documents and other information before the Court shows that criminal defendants have no connection to, and their conduct has no effect in, the United States. Under its existing precedent interpreting the High Seas Clause, the Eleventh Circuit has refused to incorporate a nexus requirement limiting Congress's authority under that Clause to only those cases where the charged conduct has a demonstrable link to, or

actual effect in, the United States. Even so, the Court has consistently held that, for the United States to apply its criminal statutes extraterritorially, as it did with Defendants, the United States is constrained by one of five principles of extraterritorial jurisdiction recognized by customary international law. Those principles include cases where there is a demonstrable link to, or actual effect in, the United States, but they also include cases where no such link or actual effect is present, particularly, those cases where there is merely a *potential* effect in the United States. None of the principles recognized by the Eleventh Circuit apply here. Defendants are foreign nationals, and their conduct did not occur in the United States, nor did it have an actual or potential effect in the United States. And their conduct is not otherwise universally punishable. Accordingly, the United States lacked the constitutional authority to prosecute Defendants for making a false statement to a Coast Guard officer while Defendants were aboard a foreign-flagged vessel located on the High Seas under Eleventh Circuit precedent, even assuming that, as the Eleventh Circuit has previously held, the High Seas Clause does not require a demonstrable nexus between the charged conduct and the United States.

Second, the Eleventh Circuit's existing interpretation of the High Seas Clause, particularly the Court's refusal to incorporate into that Clause a demonstrable nexus requirement between the charged conduct and the United States, is contrary to the original understanding of the High Seas Clause. The High Seas Clause is part of the Define and Punish Clause, which grants Congress authority to "define and punish" three separate and distinct types of crimes: (i) piracy (ii) felonies committed on the high seas; and (iii) offences against the law of nations. U.S. Const. art. I, § 8, cl. 10. In conferring on Congress the authority to define and punish these types of crimes, the Framers intended to draw a distinction between Congress's authority to define and punish "piracy" and its authority to define and punish "felonies committed on the high seas" by

3

granting Congress authority to define and punish piracy without regard to the charged crime's nexus to the United States and to define and punish felonies committed on the high seas only where a demonstrable nexus exists. The Eleventh Circuit's prior interpretation of the High Seas Clause rejecting this distinction is incorrect and should be overruled. Defendants advance this argument, which provides a separate basis for vacating their convictions, to preserve it for appellate review.

Finally, Defendants' convictions also violate the U.S. Constitution's Due Process Clause. The Eleventh Circuit has confirmed that the extraterritorial application of United States law to foreign nationals on the high seas must provide a defendant with notice and is constitutional under the Due Process Clause only in situations where the criminalized conduct is contrary to the laws of all reasonably developed legal systems. 18 U.S.C. § 2237(a)(2)(B) did not provide the constitutionally required notice to Defendants. Defendants are aware of no other nation that criminalizes the making of unsworn false statements to a government official during a boarding of a vessel on the high seas. This serves as a third separate and independent ground supporting Defendants' petition.

## JURISDICTION

Defendants were convicted by this Court of one count of violating 18 U.S.C. § 2237(a)(2)(B). The Court has jurisdiction to issue writs of error coram nobis under the All Writs Act, 28 U.S.C. § 1651(a). *See United States v. Mills*, 221 F.3d 1201, 1203 (11th Cir. 2000); *see also United States v. Peter*, 310 F.3d 709, 712 (11th 2002).

## FACTUAL BACKGROUND[1]

On October 18, 2017, Defendants were charged in a Criminal Complaint with one count of conspiracy to possess with intent to distribute a controlled substance, namely a mixture and substance containing 100 kilograms or more of marijuana, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(b). (Ex. 1.[2]) The affidavit submitted in support of the Criminal Complaint states that the Coast Guard stopped the *Jossette* "in international waters approximately 13 nautical miles off the coast of the Navassa island." (*Id.* ¶ 5.) According to the affiant, while in pursuit of the *Jossette*, "Coast Guard personnel observed the crew . . . jettison approximately 20-25 bales of suspected contraband that had been on deck," and Coast Guard personnel subsequently retrieved "several jettisoned bales in the surrounding waters that matched the appearance and size of the bales seen thrown from the [*Jossette*], which tested positive for marijuana." (*Id.* ¶¶ 5, 8.) As the United States acknowledged at sentencing, however, the Coast Guard also performed an ion scan to "test[] for illicit substances onboard the vessel," which tested negative for marijuana. (Ex. 11 at 23:23-24:4.[3])

On December 13, 2017, the United States filed an Information, which charged each of the Defendants with "knowingly and intentionally provid[ing] materially false information to a Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination."

---

[1] All cited exhibits ("Ex") are annexed to the Declaration of Daniel Tilley filed herewith.

[2] The United States also charged Patrick Wayne Ferguson and George Garee Thompson in the same Criminal Complaint. On July 12, 2019, Mr. Ferguson filed a pending motion to vacate or set aside his conviction under 28 U.S.C. § 2255 raising substantively similar grounds for relief as raised herein. *See* Motion, *Ferguson v. United States*, 1:19-cv-22901-UU-JJO (S.D. Fla. July 12, 2019) (filed at Dkt. 94).

[3] During Defendants' sentencing, the Assistant United States Attorney, prosecuting their cases represented to the Court that "the ion scan said there was something else," (Ex. 11 at 23:23-24:7), although he did not disclose what that "something else" was, and it is indisputable that, other than the Criminal Complaint alleging a marijuana conspiracy, the United States never alleged that any of the Defendants were involved in any other drug-related offense.

(Ex. 2.) According to the Information, "while on board a vessel subject to the jurisdiction of the United States, . . . the defendants represented to a Coast Guard officer that the vessel's destination was the waters near Jamaica, when in truth and in fact, and as the defendants then and there well knew, the vessel's destination was Haiti." (*Id.*) Defendants entered into substantively similar plea agreements with the United States in which they agreed to plead guilty to the sole count of the Information. (Ex. 3; Ex. 5; Ex. 7.)

Additionally, before they entered their guilty pleas, each of the Defendants and the United States signed substantively similar factual proffers setting forth the factual bases for their pleas. (Ex. 4; Ex. 6.) According to the proffers, Defendants and the United States agreed that "[i]f this matter proceeded to trial the Government would have proved beyond a reasonable doubt" certain facts, including the following:

- On September 14, 2017, the Coast Guard spotted "a vessel [the *Jossette*] speeding towards Haiti[] from the direction of Jamaica";

- The Coast Guard stopped the vessel "in international waters near Haiti";

- During the boarding process, one unnamed individual "claimed that the vessel was Jamaican and that the vessel was registered in Jamaica";

- "Jamaica was contacted," and "Jamaica confirmed the registration of the vessel, but authorized the United States to board and search the vessel";

- "Jamaica also later waived jurisdiction over the vessel," making "the vessel . . . subject to the jurisdiction of the United States"; and

- "When asked about the destination of the vessel, each of the members of the crew, including the defendant, told the United States Coast Guard boarding officers that the vessel's destination was the waters near the coast of Jamaica, where they intended to fish. This was not true. As the crew members, including the defendant, then and there well knew, the vessel's true destination was Haiti."

(Ex. 4 (Factual Proffer for Robert Weir); Ex. 6 (Factual Proffer for David Williams).)

On January 3, 2018, Defendants Weir and Williams pled guilty pursuant to their plea agreements. (Ex. 11 at 20:9-21:4.) During their plea allocutions, this Court confirmed that Defendants signed their proffers, had a full opportunity to review the proffers with their attorneys, and agreed with the facts contained in the proffers. (*Id.* at 19:4-20:8.) During the hearing, the United States admitted that the Coast Guard found no drugs onboard the *Jossette* and that ion scans confirmed the absence of any indication that marijuana had ever been onboard the vessel or on its crew members. (*Id.* at 23:8-24:7.) The United States also admitted that, although marijuana was found one mile from the *Jossette*, "it would have required a miracle" to prove that the marijuana recovered was onboard the *Jossette*, one which the United States admitted it "could not have pulled off." (*Id.* at 24:4-7.[4])

Defendants were each sentenced to ten months' imprisonment and one-year of supervised release. (Ex. 8; Ex. 9; Ex. 10.) They were released from custody on July 13, 2018, and subsequently removed from the United States to Jamaica on August 30, 2018. In addition, Defendants are each subject to a ten-year ban on reentry that will not expire until 2028.

### GROUNDS FOR GRANTING THE PETITION

**I.     Standards for Granting Writs of Error Coram Nobis**

"A writ of error coram nobis is a remedy available to vacate a conviction when the petitioner has served his sentence and is no longer in custody, as required for post-conviction relief under 28 U.S.C. § 2255." *Peter*, 310 F.3d at 712. A defendant is entitled to relief from conviction through a writ of error coram nobis where "the error comprised by a district court's acceptance of his plea was of such a 'fundamental character' as to have 'rendered the proceeding

---

[4] The docket does not contain a Factual Proffer signed by Defendant Patterson or a transcript for Mr. Patterson's sentencing, but Mr. Patterson recalls signing a document that is substantively similar to the proffers on the docket and attending a hearing in which he entered a plea of guilty to one count of 18 U.S.C. § 2237(a)(2)(B).

itself irregular and invalid.'" *Id.* (quoting *Morgan*, 346 U.S. at 509 n.15). Jurisdictional errors

have "historically been recognized as fundamental" because a "jurisdictional error implicates a

court's power to adjudicate the matter before it" and, therefore, "can never be waived by parties

to litigation." *Id.* Thus, where an error is jurisdictional, "collateral relief [is] available" and "the

doctrine of procedural default does not apply." *Id.* at 712-13; *see also Harris v. United States*,

149 F.3d 1304, 1308 (11th Cir. 1998) (holding that "jurisdictional defects … *cannot* be

procedurally defaulted"), *abrogated on other grounds by United States v. DiFalco*, 837 F.3d

1207, 1215 (11th Cir. 2016) (reiterating that "parties may not waive a jurisdictional defect").

## II.     Defendants' Constitutional Challenges are Jurisdictional and Not Waivable

The Eleventh Circuit has repeatedly held that "[t]he constitutionality of a [federal statute]

. . . is a jurisdictional issue that [is not] waive[d] upon pleading guilty." *United States v. Saac*,

632 F.3d 1203, 1208 (11th Cir. 2011); *see also United States v. St. Hubert*, 909 F.3d 335, 341

(11th Cir. 2018) (holding that a defendant's guilty plea did not "bar his claim that [the] statute of

conviction is unconstitutional"). Defendants challenge the constitutionality of 18 U.S.C.

§ 2237(a)(2)(B) as applied to the facts set forth in the charging documents and otherwise before

the Court when they entered their guilty pleas. These challenges are jurisdictional claims that are

not barred by their guilty plea. *See Saac*, 632 F.3d at 1208; *St. Hubert*, 909 F.3d at 341.

Additionally, because the claim is jurisdictional, Defendants do not need to "show 'cause' to

justify [their] failure to raise such a claim" in their initial trial proceedings or via direct appeal.

*Harris*, 149 F.3d at 1308; *Kelly v. United States*, 29 F.3d 1107, 1112 (7th Cir. 1994) (same),

*overruled on other grounds by United States v. Ceballos*, 302 F.3d 679 (7th Cir. 2002); *see also*

*Alikhani v. United States*, 200 F.3d 732, 735 (11th Cir. 2000) (holding that the defendant's

failure to raise claim at trial or on direct appeal barred coram nobis relief because the defendant's

"statutory arguments [were not] jurisdictional").

### III.     Defendants' Convictions Violate the High Seas Clause

As relevant to Defendants, section 2237(2)(a) provides:

> It shall be unlawful for any person on board a vessel . . . [registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States], to—
>
> . . .
>
> (B) provide materially false information to a Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew.

18 U.S.C. § 2237(a)(2)(B); *see also id.* § 2237(e)(3); 46 U.S.C. § 70502. When Defendants, who are Jamaican nationals, allegedly made false statements to the Coast Guard, they were onboard a foreign-flagged vessel in international waters. (*See, e.g.*, Ex. 4.) And there is no indication in the charging documents or the record before the Court that Defendants' conduct had any connection to, or actual or potential effect in, the United States. The United States acted without constitutional authority when it prosecuted and convicted Defendants under these circumstances.

Defendants challenge the constitutionality of their convictions on two separate grounds based on the High Seas Clause. First, although existing Eleventh Circuit precedent rejects the argument that the High Seas Clause imposes on the United States an obligation to demonstrate a nexus between the charged conduct and the United States, the Court has consistently recognized that extraterritorial application of United States law must be supported by a principle of extraterritorial jurisdiction recognized by customary international law. The only conceivable basis for the United States to criminalize Defendants' alleged statements to the Coast Guard is through application of the "protective" principle of customary international law. To satisfy that principle of jurisdiction, the United States must show that Defendants' conduct had a potentially adverse effect in the United States *and* is generally recognized as a crime by all nations that have

reasonably developed legal systems. The United States can make neither showing here, and the other potential bases for Congress to criminalize Defendants' extraterritorial conduct are not applicable.

Second, although Congress did not specify the constitutional power it was invoking when it enacted section 2237(a)(2)(B), presumably it was relying on the High Seas Clause of the Define and Punish Clause. The Define and Punish Clause grants Congress authority to criminalize three separate and distinct categories of conduct: (i) piracy; (ii) felonies committed on the high seas; and (iii) offenses against the law of nations. U.S. Const. art. I, § 8, cl. 10. Each of the three categories incorporates limitations on Congress's authority to define and punish these crimes, and, although foreclosed by existing precedent, the original understanding of the High Seas Clause shows that the Framers intended to limit Congress's authority to define and punish felonies committed on the high seas by requiring that Congress only exercise that authority when the defined "felonies" have a nexus to the United States. Because Defendants' conduct had no such nexus, their convictions are unconstitutional.

### A.   Defendants' Convictions are Unconstitutional Under Existing Precedent Interpreting the Extraterritorial Reach of United States Law

The "Define and Punish" Clause gives Congress authority "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the law of Nations." U.S. Const., Art. I, § 8, cl. 10. Although the Eleventh Circuit has rejected arguments that Congress's authority to define and punish felonies committed on the high seas is limited to those instances where the conduct being punished has a nexus to the United States, it has consistently held that the extraterritorial application of United States law must be supported by a principle of extraterritorial jurisdiction recognized by customary international law. *See United States v. Campbell*, 743 F.3d 802, 809-12 (11th Cir. 2014); *Saac*, 632 F.3d at 1210; *United States v.*

*Estupinan*, 453 F.3d 1336, 1338 (11th Cir. 2006). Thus, the Eleventh Circuit has held that "international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas" unless that country can demonstrate the existence of an internationally recognized basis for the exercise of extraterritorial jurisdiction, such as (i) the "protective" principle of jurisdiction; (ii) the "objective" principle of jurisdiction; or (iii) "universal jurisdiction." *United States v. Marino-Garcia*, 679 F.2d 1373, 1380-82 (11th Cir. 1982); *see also Campbell*, 743 F.3d at 809-10. None of these bases for the exercise of jurisdiction justify Defendants' convictions. Because the United States lacked jurisdiction to prosecute Defendants, their convictions should be set aside or vacated.[5]

### 1.    The Protective Principle Does Not Apply to Defendants

Under the protective principle of jurisdiction, states may "assert jurisdiction over foreign vessels on the high seas that threaten their security or governmental functions." *Marino-Garcia*, 679 F.2d at 1381. For the protective principle to provide jurisdiction to the United States to criminalize extraterritorial conduct, the Eleventh Circuit has required the United States to demonstrate that the charged conduct "has a potentially adverse effect [in the United States] *and* is generally recognized as a crime by nations that have reasonably developed legal systems." *United States v. Gonzalez*, 776 F.2d 931, 939 (11th Cir. 1985) (citing Restatement (Second) of Foreign Relations Law of the United States § 33) (emphasis added). The United States can satisfy neither prong of the protective principle here.

---

[5] The United States may also regulate extraterritorial conduct pursuant to the so-called "passive personality" and "nationality" principles, but neither principle justifies the United States' regulation of  Defendants' conduct here. *See United States v. Malago*, No. 1:12-CR-20031, 2012 WL 3962901, at *4 (S.D. Fla. Sept. 11, 2012) (passive-personality principle justifies the regulation of "persons or vessels that injure the citizens of another country"); *United States v. Plummer*, 221 F.3d 1298, 1307 (11th Cir. 2000) (the nationality principle "permits a state to exercise criminal jurisdiction over one of its nationals").

First, merely providing a false statement to the Coast Guard regarding a vessel's destination does not have the type of "potentially adverse effect" in the United States that is required by the protective principle of jurisdiction. "Protective" jurisdiction is not a general catchall principle intended to cover any situation in which an individual allegedly provides a false statement during an extraterritorial interaction with a federal officer. It instead applies to a much narrower subclass of conduct. The Eleventh Circuit has recognized this limited scope, specifically identifying cases applying the protective principle as those that "generally involve forgeries of government documents in foreign countries or attempts to illegally obtain entry into the United States." *Marino-Garcia*, 679 F.2d at 1381 n.14 (collecting cases). And the limited scope of protective jurisdiction is further confirmed by the Restatement (Second) of Foreign Relations Law of the United States, on which the Eleventh Circuit expressly relied. *See Gonzalez*, 776 F.2d at 939-40; *Marino-Garcia*, 679 F.2d at 1381 & n.14. Like the Eleventh Circuit, the Second Restatement identified the types of extraterritorial conduct that a state is authorized to criminalize, including "in particular the counterfeiting of the state's seal and currency, and the falsification of its official documents." Restatement (Second) of Foreign Relations Law of the United States § 33(2).

Updated versions of the Restatement post-dating *Gonzalez* and *Marino-Garcia* have only served to further narrow a state's exercise of protective jurisdiction. The Third Restatement, for example, provided that the protective principle only applies to justify the regulation of "*a limited class* of other state interests." Restatement (Third) of Foreign Relations Law of the United States § 402(3) (emphasis added). And the Fourth Restatement provides that the protective principle only covers regulation of "a limited class of other *fundamental* state interests, such as espionage, certain acts of terrorism, murder of government officials, counterfeiting of the state's seal or

currency, falsification of official documents, perjury before consular officials, and conspiracy to violate immigration or customs laws." Restatement (Fourth) of Foreign Relations Law of the United States § 412 (emphasis added). The Fourth Restatement's addition of "the word 'fundamental' [was, in fact, intended] to emphasize the *limited class of interests covered*" by protective jurisdiction. *Id.* § 412, cmt. 3 (emphasis added).

In all of the instances where the Eleventh Circuit or the various Restatements have recognized the protective principle as providing a valid basis for the exercise of extraterritorial jurisdiction, the potentially adverse effect in the United States is obvious. The offender affirmatively seeks out, and interacts with, United States officials or United States documents in an attempt to enter the country under false pretenses (*e.g.*, by applying for a Visa at a U.S. Consulate) or in an attempt to obtain some other benefit in a foreign nation with the imprimatur of the United States (*e.g.*, by forging an official United States document while in a foreign country). *See, e.g.*, *United States v. Pizzarusso*, 388 F.2d 8, 9 (2d Cir. 1968) (defendant made false statements in visa application). They sign documents under penalty of perjury and are aware, or reasonably should be aware, that the provision of false information carries criminal consequences.

Conversely, in no instance has the protective principle of jurisdiction been applied to authorize the extraterritorial application of a general "false statement" offense, like section 2237(a)(2)(B). For good reason. Such an offense is fundamentally different from the types of offenses commonly cited as examples of cases in which the protective principle *does* apply. During a boarding of a foreign-flagged vessel on the high seas, like the Coast Guard's boarding of the *Jossette*, the *federal officials* initiate contact with foreign nationals. From the foreign nationals' perspective, their contact with the United States is pure happenstance, dependent on

the fortuitous presence of federal officials in the same vicinity of the high seas. When responding to the federal officials' general questions regarding the destination of their vessels, the foreign nationals are not sworn to tell the truth under penalty of perjury, nor would they have any reason to know that they are subject to United States law. Defendants, for example, were standing on the deck of a Jamaican-flagged vessel on the high seas off the coast of Haiti. No one in their position would reasonably understand that they were subject to criminal prosecution in the United States when they allegedly responded to the Coast Guard's questions.

And, assuming for purposes of this petition that Defendants made material false statements when they allegedly told the Coast Guard "that the vessel's destination was the waters near the coast of Jamaica, where they intended to fish," when they "then and there well knew, the vessel's true destination was Haiti," (Ex. 4; *see also* Ex. 6), it defies all conceivable logic to suggest that these false statements could have any potential adverse effect in the United States. This is especially true where, as here, the United States claims that Defendants' intended destination was Haiti, and the Coast Guard observed, pursued, and then intercepted the *Jossette* while it was traveling *towards Haiti*. The United States cannot credibly argue that the facts set forth in the Information and Defendants' factual proffers warrant application of the protective principle of jurisdiction because of their "potential adverse effect" in the United States.

Second, as set forth above, for the protective principle to apply, the conduct at issue, in addition to having "a potentially adverse effect [in the United States]," must also be "generally recognized as a crime by nations that have reasonably developed legal systems." *Gonzalez*, 776 F.2d at 939. Defendants are aware of no other nation that has criminalized the making of false statements to government officers during a boarding of a vessel on the high seas regarding the vessel's destination. This apparent lack of consensus on the criminality of the proscribed conduct

14

among nations that have reasonably developed legal systems is, standing alone, an independent ground sufficient to show that the protective principle does not justify the United States' criminalization of the conduct at issue here, nor the United States' prosecution and conviction of Defendants.

### 2.      The Objective Principle Does Not Apply to Defendants

Under the objective principle, "a vessel engaged in illegal activity intended to have an effect in a country is amenable to that country's jurisdiction." *Marino-Garcia*, 679 F.2d at 1380-81. The facts set forth in the Information and Defendants' factual proffers provide no indication that the *Jossette* or Defendants were engaged in any activity intended to have an effect in the United States, let alone illegal activity. When the Coast Guard intercepted the *Jossette*, that vessel was traveling in international waters toward Haiti. The only allegedly false statement Defendants made had to do with the *Jossette*'s destination and, specifically, whether it was destined for Jamaica or Haiti. The United States, therefore, cannot justify Defendants' prosecutions and convictions based on the objective principle of jurisdiction.

### 3.      Universal Jurisdiction Does Not Apply to Defendants

Universal jurisdiction authorizes a state to criminalize only a limited subset of universally proscribed conduct "such as the slave trade or piracy." *Marino-Garcia*, 679 F.2d at 1381-82. General false statements statutes, like section 2287(a)(2)(B), do not address universally prohibited crimes like the slave trade or piracy. *See United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1260-61 (11th Cir. 2012) (Barkett, J., concurring) ("Although '[i]nternational criminal law evidences the existence of twenty-seven categories[,]' only the so-called *jus cogens* crimes of 'piracy, slavery and slave-related practices, war crimes, crimes against humanity, genocide, apartheid, and torture' have thus far been identified as supporting universal jurisdiction.").

Accordingly, the United States was not authorized by universal-jurisdiction principles to prosecute and convict Defendants.

### B. Defendants' Convictions Violate the Original Understanding of the Define and Punish Clause[6]

The Define and Punish Clause "contain[s] three distinct grants of power": (1) "the power to define and punish piracies" ("Piracies Clause"); (2) "the power to define and punish felonies committed on the high seas" ("High Seas Clause"); and (3) "the power to define and punish offenses against the law of nations" ("Offences Clause"). *Bellaizac-Hurtado*, 700 F.3d at 1248 (citing *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 158-59 (1820)). Because the Clauses are distinct, they should be interpreted in such a way as to give each of them an independent effect— *i.e.*, an effect that grants Congress a non-redundant power to define and punish specific conduct not covered by the others. *See Marbury v. Madison*, 1 Cranch 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect."). Making a false statement to a federal officer is not an act of piracy, *see Bellaizac-Hurtado*, 700 F.3d at 1248 ("piracy is, by definition, robbery on the high seas"), nor is it an offense against the law of nations, *see id.* at 1251 ("the 'law of nations' . . . means customary international law"). To justify the constitutionality of Defendants' convictions, the United States must, therefore, rely on the High Seas Clause. But the original understanding of that Clause does not support Defendants' convictions.

Few courts have explored the limits placed on Congress's ability to legislate pursuant to the High Seas Clause. And it is now assumed—in this Circuit at least—that the High Seas Clause

---

[6] Defendants acknowledge that components of this argument are contrary to existing Eleventh Circuit precedent, *see Saac*, 632 F.3d at 1209; *Estupinan*, 453 F.3d at 1338-39, and that this Court is bound by that precedent. They make this argument to preserve the issue for appellate review.

gives Congress the power to criminalize conduct occurring on the high seas even in cases where there is no nexus between the crime, its perpetrators and victims, and the United States. *See Saac*, 632 F.3d at 1209 ("While there is a dearth of authority interpreting the scope of Congress's power under the High Seas Clause, early Supreme Court opinions intimate that statutes passed under the High Seas Clause may properly criminalize conduct that lacks a connection to the United States."). For the reasons that follow, this interpretation of the High Seas Clause is incorrect and contrary to the original understanding of the Clause's limitations. The power conferred by the High Seas Clause can only be exercised when the proscribed conduct has a nexus to the United States. Because there was no such nexus here, Defendants' convictions are unconstitutional.

To properly understand the limits of the High Seas Clause, the Court should first consider Congress's power pursuant to the Piracies Clause. At the time of the founding, "[p]iracy was the only [universal jurisdiction] offense" commonly recognized in international law, meaning it was the only offense "that a nation [could] prosecute . . . even though it [had] no connection to the conduct or participants." Eugene Kontorovich, "Beyond the Article I Horizon, Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes" ("Beyond the Article I Horizon"), 93 Minn. L. Rev. 1191, 1192, 1209 (2009); *see also Smith*, 18 U.S. (5 Wheat.) at 162 (recognizing the "general practice of all nations in punishing all persons, whether natives or foreigners, who have committed [the] offense [of piracy] against any persons whatsoever"); *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133, 159-60 (1795) ("All piracies and trespasses committed against the general law of nations, are enquirable, and may be proceeded against, in any nation."). Accordingly, pursuant to its authority under the Piracies Clause, Congress could define and punish acts of piracy even in cases where the acts had no nexus to the United States. *See*

*United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 197 (1820) (recognizing that piracy "is considered as an offence within the criminal jurisdiction of all nations" because "[i]t is against all, and punished by all"); *see also United States v. Dire*, 680 F.3d 446, 455 (4th Cir. 2012) (recognizing that "general piracy" punishable under the Piracies Clause "is created by international consensus" and is therefore "restricted in substance to those offenses that the international community agrees constitute piracy").

Congress's power under the Piracies Clause is not, however, unlimited. Piracy has a specific and commonly recognized definition—"robbery on the high seas." *Bellaizac-Hurtado*, 700 F.3d at 1248; *see also Furlong*, 18 U.S. (5 Wheat.) at 196-97. Congress cannot simply define any offense—such as making a false statement to the Coast Guard—as an act of piracy punishable without regard to its nexus (or lack thereof) to the United States. *See Dire*, 680 F.3d at 455 (favorably discussing distinction drawn by district court between "general piracy" punishable as a universal-jurisdiction offense under the Piracies Clause and "municipal piracy" punishable under the High Seas Clause, the latter of which "is flexible enough to cover virtually any overt act Congress chooses to dub piracy," but "is necessarily restricted to those acts that have a jurisdictional nexus with the United States"). The Supreme Court made this limiting principle on Congress's power clear in *Furlong*. The Court held that the United States could not punish murder "committed by a foreigner upon a foreigner in a foreign ship." *Furlong*, 18 U.S. (5 Wheat.) at 197. In so holding, the Court relied on the "well-known distinctions between the crimes of piracy and murder, both as to the constituents and incidents." *Id.* at 196-97. According to the Court, murder, unlike the crime of piracy, "is an offence too abhorrent to the feelings of man, to have made it necessary that it also should have been brought within [the] universal jurisdiction" of all nations. *Id.* at 197. Thus, the Court determined, "punishing [murder] when

committed within the jurisdiction, or, (what is the same thing,) in the vessel of another nation, has not been acknowledged as a right, much less an obligation." *Id.* In other words, the "felony" of murder was not a universal-jurisdiction offense and could not be punished in this country absent a demonstrable nexus to the United States. *See Bellaizac-Hurtado*, 700 F.3d at 1249 (citing *Furlong* for the proposition "that Congress may not define murder as 'piracy' to punish it under the Piracies Clause").

The distinction relied on in *Furlong* between piracy and murder should control the Court's interpretation of the Piracies and High Seas Clauses. Congress has the authority to define and punish an act of piracy without regard to whether the act has a nexus to the United States, and it has the separate and distinct authority to define and punish additional, non-piracy felonies committed on the high seas to the extent those felonies have a nexus to the United States. *See* Kontorovich, Beyond the Article I Horizon, 93 Minn. L. Rev. at 1251 ("In general, the Constitution does not empower Congress to legislate over foreigners in international waters or abroad. If Congress could do so, its powers would be unlimited."); *see generally United States v. Cardales-Luna*, 632 F.3d 731, 739-47 (1st Cir. 2011) (Torruella, J., dissenting). This interpretation gives both the Piracies Clause and the High Seas Clause independent, non-redundant meanings. The Piracies Clause applies to a limited subset of "felonies" but is expansive in its territorial reach. The High Seas Clause, conversely, covers the broad spectrum of felonies defined by Congress, but is limited by the nexus requirement, a requirement that does not constrain Congress when acting pursuant to the Piracies Clause.

Further, interpreting the High Seas Clause to incorporate a nexus requirement is consistent with founding-era practices implying such a limitation, which provides additional support for this interpretation. *See Mistretta v. United States*, 488 U.S. 361, 401 (1989)

("[T]raditional ways of conducting government . . . give meaning to the Constitution."); *see also NLRB v. Noel Canning*, 573 U.S. 513, 526 (2014) (reiterating that "postfounding practice is entitled to 'great weight'" in interpreting the Constitution). Most notably, as detailed by Professor Eugene Kontorovich, "[i]n 1820 Congress went further than it or any other nation had ever gone before by declaring the slave trade a form of piracy punishable by death." Eugene Kontorovich, "The 'Define and Punish' Clause and the Limits of Universal Jurisdiction," 103 Nw. U. L. Rev. 149, 194 (2009). Although Congress "wanted to end the slave trade globally," it nevertheless cabined the reach of the statute to "only punish [the slave trade] to the extent that it had a demonstrable U.S. nexus." *Id.* Congress in 1820 recognized that its authority to criminalize conduct not traditionally understood to be piracy was limited. The fact that Congress did *not* extend its anti-slave trade statute to reach conduct regardless of its nexus to the United States is a strong indication that it perceived itself as lacking the authority under the Felonies Clause to do so. *See id.* at 196 ("In short, only if the conduct were a universally cognizable offense in international law did the [House Committee on the Slave Trade] feel it could cast a universal net.").

Defendants are foreign nationals. At the time the Coast Guard stopped them, they were lost on the high seas and the *Jossette* was heading towards Haiti.[7] The record is clear that Defendants had no connection to the United States whatsoever. It is also clear that they were not engaged in an offense, like piracy or slave-trading, that can constitutionally be punished without such a nexus. Congress lacked the constitutional authority to criminalize Defendants' statements

---

[7] The fact that the *Jossette* was travelling towards Haiti at the time it was intercepted by the Coast Guard is demonstrably true. Although Defendants pled guilty to making false statements, they did not know where the *Jossette* was heading at the time of their interaction because they had been blown off course in a storm and were lost. Regardless, Defendants do not here challenge the factual basis for their pleas that they made material false statements to the Coast Guard.

to the Coast Guard, and this Court, therefore, lacked jurisdiction to prosecute and convict Defendants of violating 18 U.S.C. § 2237(a)(2)(B).

**IV.    Defendants' Convictions Violated the Due Process Clause**

Defendants' convictions also violated the Due Process Clause of the Fifth Amendment. In *Campbell*, the Eleventh Circuit reiterated that extraterritorial application of a federal statute criminalizing drug trafficking did not violate the Due Process Clause because "the [statute] *provides clear notice that all nations prohibit and condemn drug trafficking*." 743 F.3d at 812 (emphasis added); *see also Gonzalez*, 776 F.2d at 941 (statute did not violate due process because it criminalizes "conduct which is contrary to laws of all reasonably developed legal systems" and, therefore "does not create a notice problem."). The same cannot be said for the crime of merely providing false information to a Coast Guard officer about a vessel's destination during a boarding of that vessel. 18 U.S.C. § 2237(a)(2)(B). Defendants had no notice that they would be putting themselves in jeopardy in the United States when they told the Coast Guard the *Jossette*'s "destination was the waters near the coast of Jamaica" after the Coast Guard intercepted the *Jossette* in international waters while it was traveling towards Haiti. Defendants are aware of no other nation that criminalizes such conduct.  Accordingly, their convictions violate the Due Process Clause.

<b>CONCLUSION</b>

For all the foregoing reasons, Defendants respectfully request that the Court grant their petition for the issuance of writs of error *coram nobis* vacating their convictions for knowingly providing a materially false statement to a federal law enforcement officer, during a boarding, while on board a vessel subject to the jurisdiction of the United States, in violation of 18 U.S.C. § 2237(a)(2)(B).

21

Dated:    Miami, Florida                    Respectfully submitted,
          August 15, 2019

                                      By:   /s/ Daniel B. Tilley
                                            Daniel B. Tilley
                                            Florida Bar No. 102882
                                            ACLU Foundation of Florida
                                            4343 W. Flagler St., Suite 400
                                            Miami, FL 33134
                                            T. (786) 363-2714
                                            F. (786) 363-1257
                                            DTilley@aclufl.org

                                            Steven M. Watt*
                                            Jonathan Hafetz*
                                            American Civil Liberties Union Foundation
                                            125 Broad Street, 18th Floor
                                            New York, NY, 10004
                                            (212) 519-7870
                                            swatt@aclu.org
                                            jhafetz@aclu.org

                                            Joshua S. Sohn*
                                            Patrick N. Petrocelli*
                                            Sarah M. Roe*
                                            Stroock & Stroock & Lavan LLP
                                            180 Maiden Lane
                                            New York, NY 10038
                                            (212) 806-5400
                                            jsohn@stroock.com
                                            ppetrocelli@stroock.com
                                            sroe@stroock.com

                                            *Application for admission *pro hac vice*
                                            forthcoming

                                            *Attorneys for Defendants Robert Dexter Weir,
                                            David Roderick Williams, and Luther Fian
                                            Patterson*

**CERTIFICATE OF SERVICE**

Today, I electronically filed this document the foregoing document with the Clerk of the

Court using CM/ECF. I also certify that these filing documents are being sent today to all

counsel identified below via U.S. mail:

United States Attorney's Office
99 NE 4th St., Miami, FL 33132


/s/ Daniel B. Tilley
Daniel B. Tilley